Good morning, Your Honors. My name is Maureen Jacob, representing the appellant Robert Fabela this morning. I would like to reserve two minutes of my time for rebuttal, please. Okay, and the clock counts down, and keep your eye on the clock. Thank you. Your Honors, this case is a situation where we have a district court that has taken a square peg and tried to jam it into a round circle. There are three issues on appeal. I'd like to first start by talking about the district court's error in concluding that Mr. Ryan's Facebook posts were a matter of public concern. The district court did not correctly apply the legal standard, focusing too much on the content and not giving enough weight to the form or context. The form and context of an employee's speech, including the motivation when taken together, may outweigh the content of the speech and result in a finding that First Amendment protection is unwarranted. Well, what I'm trying to figure out with respect to that argument is whether it's one of law or fact. Your Honor, it is absolutely a question of law. Well, but you just said we need to look at the context. We need to look at the form. And I start off from the premise we can't review the district court's conclusions that there are disputed issues of fact in this case. Correct. And so on that one, I'm not sure, to use your analogy, which peg matter of public concern fits into. Your Honor, I think that— Doesn't it depend on the facts of the case? It does depend on the facts of the case. But the way in which the facts are weighed against the legal standard is, in fact, a question of law. So what the district court did was look at the content of the Facebook posts and rule based on the content alone that it was a matter of public concern, and they gave not enough weight to the context, which involves the motivation behind Mr. Ryan's posts. It's your argument that gives me this concern. Once we start talking about weight, we're talking about factual determinations, I think, as opposed to facial determinations, if you will. And so I'm not clear about the answer to this, but I worry about whether or not whether something is a matter of public concern in the context of a particular setting doesn't take us back to issues that we may not be able to review. Had the Facebook posts merely said, he's a mean guy at work, I think that would be a matter of— easy matter of law to say that's not a matter of public concern. But here we have a counsel race, and we're trying to look at it in context. Does that make it a factual determination? Well, Your Honor, in this case, the district court made its finding as a matter of law, which is why we were able to bring the issue up on appeal. It would not have been proper for Mr. Fabella to bring an appeal on a disputed issue of material facts. Well, on the other hand, you do argue that—I mean, to be fair, you do argue a couple of the factual issues in your brief. You say, for example, that, you know, that he was acting—he was not— he was acting—not acting as a private citizen. That's a—that's classically a factual issue, isn't it? We raised that at the lower court, Your Honor, but we are not— So you agree for present purposes that he was acting as a private citizen and that for present purposes he was fired because of the posts? He—what we're arguing, Your Honor, is that the posts were not a matter of public concern. No, I agree. I understand you. I just want to be clear for my own purposes. For our purposes on appeal, we all agree that he was fired because of the posts and he was acting as a private citizen when he posted them, correct? So the preliminary argument is it was not a matter of public concern. If, in fact, this Court determines that he did speak on a matter of public concern, then the Pickering balance test requires the Court to weigh whether Mr. Fabella and VTA's interests outweighed those of— I understand. But as a—I'm not sure it's a preliminary matter. After all, if we all agreed that he was doing— if he did this on state time and a state computer, acting as a public servant, we'd never get to whether it was a matter of public concern, right? I think it would depend on the— Don't you have to be acting as a private citizen for the First Amendment settlement? That's correct, Your Honor. Okay. So given those assumptions, why wasn't—the part of this case that I find tricky and I'd like you to address is the question of whether he was a policymaker. The district court's decision on that makes a lot of sense to me because he didn't seem to make policy. But we've got all these strange decisions out there involving lawyers. Public defenders are not, but contract attorneys for the city are and assistant prosecutors are. What's the clearly established law in this area, if any? Your Honor, I think that this court should follow its own precedent in the Biggs case. In the Biggs case, an attorney was fired from her position with her private law firm. She was performing in a capacity as a city attorney for a client agency and was terminated. This court established and held in that case that an attorney occupies a policymaking position with respect to the city, and so the council member's threats to fire her law firm based on her political activities did not violate the attorney, in that case, clearly established First Amendment rights. And I think that principle applies here. And, in fact, in Biggs, this court stated that, quote, many cases have addressed the role of attorneys in city government and almost all of them have found that such attorneys are, in fact, policymakers, and that should be followed in this case as well. For you to prevail, do we have to follow Biggs, or is it sufficient that we conclude that the law is not clearly established in this area? The latter, Your Honor. Now, I know that Your Amici would love us to come out with a big statement about where the dividing line for lawyers is, but at least for purposes of this case, isn't the question of whether the law is clearly established? Around the policymaker? Around whether an attorney in Mr. Ryan's position is a policymaker. Your Honor, I think that under Biggs, the case is analogous, and so this court can, relying upon Biggs, make that determination, that, in fact, yes, it is clearly established. An attorney who reports to a department head in a 10-person legal department that reports directly to a board of directors for a transit agency is carrying out the policies and regulations that are set by that board. But isn't Biggs a little different? Biggs is a city council that's not rich enough to hire its own in-house lawyers, and so they hire a law firm, and they find the people in the law firm are engaging in political activity that's not consistent with the council's view. Isn't that a slightly different context? Respectfully, Your Honor, I don't think it is. The duties owed to a client are the same duties, whether you're outside counsel or in-house counsel. Yeah, you know, one of the troubles with the label that's been attached, a policymaker, is that we see it in at least two different contexts, and the operation and purpose of the label is very different. One of them is the Monell context. Can we hold the county liable for the action of this person because he or she is a policymaker? That's not what's at issue here. And so the policymaker analysis from those cases really is off the table. What we're really looking at here is, basically, is this somebody who looks like a political appointee or close enough to a political appointee that the person does not have the protection that would belong to, say, somebody's civil service? Well, he doesn't look much like a political appointee to me. But he does serve at the pleasure, I take it. He serves at the pleasure of the board, Your Honor, as a member of the general counsel's office. But, of course, most people in most circumstances serve as at will, public unions restrict that to some degree, but just because he serves at the pleasure of doesn't mean he's a policymaker. I would agree with that statement, Your Honor. However, as a member of the general counsel's office and for a period of time was the only member practicing in labor and employment law, his advice was directly impacting the board, which is setting policy for the agency. I also want to make clear that the policymaker rule also includes confidential employees, which attorneys obviously have a duty of confidentiality to their employers. In addition, Fabella, as the department head, had an interest in accomplishing the board's objectives through a compatible policy level or confidential employee who did not disloyally take a position against an employee of VTA or take public positions that are contrary to the VTA board. What was Mr. Ryan's attorney-client relationship with Mr. Tarraza? Tarraza's? Yes. So the attorney-client relationship here was between Mr. Ryan and VTA. Of course. But, I mean, did he – what I can't – the record says they regularly interacted.  Does it tell us more? Yes. Did Mr. Ryan provide legal advice to Mr. Tarraza's? He did, Your Honor. So Mr. Tarraza's was the labor relations manager. Mr. Ryan worked as the attorney in the general counsel's office who did labor arbitrations basically and provided labor relations advice to Mr. Tarraza's, who was the manager overseeing labor relations. About 50% of Mr. Ryan's work involved this labor arbitration work and the rest of it was advice and counsel. So they were very closely connected, and certainly communications between Mr. Tarraza's and Mr. Ryan would fall within the scope of the attorney-client privilege. Can you assume that you're going to lose on the point you've just been debating? This was on a matter of public concern. Can you shift to your sort of fallback argument, I guess, is the way you're using it? Yes, Your Honor. I would be happy to do that. So the district court additionally erred in concluding that Mr. Ryan's speech interests outweighed VTA's or Mr. Fabella's interests. At the district court level, Mr. Ryan alleged he was fired due to Facebook posts. Assuming that to be the case, for purposes of this appeal, Mr. Fabella's interests in the effective and efficient operations of his department outweigh any interest that Mr. Ryan would have had in posting on Facebook about Mr. Tarraza's. Why is that once Mr. Tarraza's left? I'm sorry, Your Honor. Why is that true once Mr. Tarraza's left? In other words, I can understand if he said, look, I got to keep Tarraza's. He's very good at what he does and I can't have you here being disruptive with him around. But as I read the record, they sort of left somewhat simultaneously. So there's no real danger of disruption with respect to Tarraza's after he leaves, is there? Well, there was significant disruption, Your Honor. In February of 2015, when the demand letter was issued by Mr. Tarraza's, the department was forced to separate Mr. Ryan and Mr. Tarraza's, which was a huge disruption on this small in-house attorney office, requiring another attorney to come in and do this very specialized labor and employment work. In addition, VTA was forced to enter into settlement negotiations with Mr. Tarraza's, Mr. Fabello was required to spend his time and attention away from his duties as general counsel to address the possibility of anticipated litigation and to address. . . And I guess my question was maybe not well phrased. The firing occurred after all this disruption was, after the future cause of any disruption was removed, which is to say Mr. Tarraza left the agency. After that point, there's probably no danger of disruption, is there? I don't think we can safely say that, Your Honor. Mr. Ryan was engaged in an eight-year campaign of harassing Mr. Ryan, and there is nothing to suggest that that would not have continued with the next labor relations manager. And again, I want to stress that the focus here is not on what could happen in the future, but in fact what disruption did occur, and that was substantial. The final point I'll make before reserving the rest of my time is that on qualified immunity grounds, Mr. Fabello should have the district court's summary judgment finding reversed, because Mr. Ryan cannot clearly show that he was deprived of a constitutional right, and there is no indication that that right was clearly established, given the murky nature of First Amendment law, and I'll reserve the rest of my time. Can I ask you just one very specific factual question before you sit down? Yes, Your Honor. Does the record disclose how Tarraza's found out about the Facebook page's existence? How Mr. Tarraza's found out? He filed a lawsuit, Your Honor, and issued a subpoena, and — Stop, stop. I'm just — the thing existed. I'm sorry. What existed? The Facebook page. How did it come to his attention that it was even out there? That is not in the record, Your Honor. Okay. Thank you. Well, we've taken you right up to the end of your time. We will make sure to give you a chance to respond. I appreciate it. Thank you, Your Honors. Good morning, Your Honors. My name is Charles Bonner, appearing on behalf of the appellee, Mr. Joseph Ryan. As an introductory comment, I would like to remind the Court that liberty is meaningless where the right to utter one's thoughts and opinions has ceased to exist. When Mr. Frederick Douglass issued those words, he understood the importance of liberty. Mr. Ryan here did exactly what Mr. Thomas Jefferson wanted us to do in a democracy, engage in political debate. Well, that makes — that's — I agree with everything you've said so far. Thank you. Except neither Mr. Douglass, when saying that, or Mr. Jefferson, were talking about lawyers disparaging their clients. So we have a slightly different situation here. Well, we ultimately are talking about liberty and freedom of speech in a political debate, aren't we? Because the very post here, which was done on Mr. Ryan's private computer, in the wee-wee hours of his own home, a Facebook that he created, not having anything to do with his employer, where he says, elect anyone except Terrasas for city council. So the very title is political speech. Well, but some of the posts say, and here's why. I work with him. And I — he treats employees badly at work. Well, interestingly — He professes at work to be — he professes at work to be green, but he wastes gas. So it's information derived from his work relationship that's in the posts. And that's one of my concerns about the sort of — it's one thing to say he's a liberal or a conservative, and I'm not. Yes. But it's the sort of — I know this guy from work because I work with him and I'm his lawyer. Yes. And he's a bad guy. Well, Judge Hurwitz, that's a good point. No, but here, factually, that's not the record. That's not the evidence. The evidence here is that nowhere on this post was Mr. Ryan identified as a co-worker of Mr. Terrasas. No, but he did say he treats people — he treats co-employees badly, did he not? No, what he said is that politically — he said three things. Politically, where is he on the women's issues? And — Secondly — Yes, go on. And what did he say on the women's issues? What was the reason that he gave for thinking that he might not be good on the women's issues? Why would he be hired over two women? And if he's such a good politician, in other words, electorate in the public, you make a decision whether this is someone you want to hire. This is an interview for a job. This man is running for an election. He's to be interviewed by the public. There should be references, just like we all give references. The second thing the post said was, where is he on environmental issues? He works for public transportation services, but yet he's a green guy, but he drives to work every day. That's a political issue in our faint green world. Thirdly, he said, there's a misrepresentation of his job. I learned — at least, Mr. Ryan indicated, the Mercury News published — that his title is that of job relations. Now he's saying he's a transportation manager. Well, if you're hiring someone for a job as the electorate is going to hire the city council member, they need to know whether this is someone you can trust, or whether he has a propensity to misrepresent the facts. Let me try my question differently, because you and I aren't disagreeing. I assume these are matters of public concern. Clearly, election is the highest — I assume that one generally has a First Amendment right to speak about matters of public concern. Absolutely, regardless of whether it's political. OK. But if Judge Fletcher's law clerks go out tomorrow and speak about matters of public concern, and he believes that — or make it my clerks, and I believe that that would jeopardize their effectiveness in their job, I can probably fire them. And so the question isn't whether or not — the question is, in this context, why isn't it OK for the employer to fire Mr. Ryan? Not whether or not he — these are generally matters of public concern, or they're about political debate. But we have a particular context. He's a lawyer for an agency, and he's speaking about one of the people in the agency to whom he provides legal advice. Why, in that context, can't they fire him? Well, that raises the point that you first raised, Judge Hurwitz, which is, isn't that a factual matter? And if it's a factual matter, then the summary judgment is — It's a factual matter about whether the law is clearly established in this area, and that's my concern. Yeah. I'm not sure the law is clearly established one way or the other, and that's why — so help me with that. Well, I'll help you with that. The law is very clearly established, as the Hunt case versus Count of Orange makes very clear, since 2006, that a public employer cannot fire an employee who exercised speech unless he is some kind of policymaker. Now, in the hypothetical, where is your clerk? If you can show that the clerk had some policymaking — Or confidential. Confidential information, in speaking about that information, then, sure, that's the exception where you can — and this is a narrow exception because of the paramount importance of the First Amendment, a narrow exception. The problem here, this record is totally void of any facts that would lead this Court to conclude as a matter of law they're entitled to qualified immunity. No, but I'm going back to clearly established law. Yeah. And Hunt is a public defender. Yeah. Hunt was the — in Hunt, there was the chief of police. Right. In Orange County. Right. Now, I'm talking about the — let's talk about the cases involving lawyers. Certainly. Certainly. The Supreme Court keeps telling us, don't make general assumptions from case law in 1983 cases. Try to find ones with specific facts. Right. And so we have — we have Biggs, which has been discussed. Right. Exactly. We have another — what other case — and we have a case involving public defenders. Right. What other cases help me in this area? We cited — Involving lawyers. By lawyers. We cited several cases, including the case where the attorney, the staff attorney, was the — worked in a law firm with the — a law firm that also was the city attorney. Right. And in that one, we said that's a policymaker. Well, we said the policymaker because we're talking about someone who was advising the city council, someone who was making policy because the city attorney, even though it The problem here is, on this record, there are no facts that Mr. low-level labor relations attorney Joe Ryan, who was only doing arbitrations in union disputes, managing a memorandum of understandings, who never saw the board of — the board of the Valley Medical Authority and Valley Transit Authority, never saw them, never been to their board meetings, never advised them at all. He doesn't know what they look like. He didn't make any policies about anything. He didn't supervise anyone. He was just a staff attorney doing arbitration. His client was the — not any particular individual, such as Tarasso or Lopez or the other individual, Escobar. His client was the — the administrative services. And let me just stop you for a second, because you're telling me essentially what Judge Coe said in her order. And, frankly, I think it may be right as a matter of constitutional law. Certainly. My difficulty is figuring out whether or not this is clearly — this was clearly established at the time. Let's drill down. And so tell me what cases. I'm still — let me tell you what cases I have and tell me a few others. Fair enough. We've got Biggs, which has been discussed. Yes. We've got Fazio, which is the assistant district attorney who is the head attorney in the office. Right. And we have Branty and Finkel, which is a Supreme Court case involving public defenders. Are there any other Ninth Circuit cases or Supreme Court cases involving the firing of a lawyer allegedly for exercising First Amendment rights? Well, I think the Biggs is really the kind of illustrative case on that, but it didn't say all lawyers. Okay. But before you — Yeah. Before you get to Biggs, I'm asking you to help me. Are there any other Ninth Circuit cases? Yeah. We cite several in our case. Ninth Circuit? But those cases also make the point you've got to look at the duties, not the job description. You can't take a job description in this case because Joe Ryan is the senior attorney and say, therefore, he's a policymaker. His seniority is only by virtue of the years of service, the fact that he had been there longer than anyone else. It didn't alter his duties. So it's very important to look at the duties. I mean, simply because you call someone Moses doesn't mean he can part the Red Sea, so to speak. You've got to look exactly what his duties are. And in terms of the cases, we cite the cases in our brief. They are — there are several of them dealing with all the attorneys. It's under this idea that simply because Ryan was an attorney that he, therefore, is a policymaker. That is not the law. And they are — they are definitely in our — in our brief. And I will reserve a couple of minutes and I'll point them out to you when we come back. Well, if they're in your brief, I'll find them. Yeah, they're in the brief. I was — what I was trying to do was separate the cases in your brief that dealt with other types of employees and those that dealt with lawyers. Yeah. And I thought I'd separated them, but I'm not sure I have. I'll go back and look. Yes, they were in the brief. Here's a question I've got with respect to what was in the Facebook post. And you accurately described what's in the Facebook post. I'm not sure it's confidential or secret information that he's using, but he's certainly using information that comes to him because he's employed there. I'm thinking particularly of his charge that Mr. Tarazos was hired over two very well-qualified women. His qualifications didn't match, and hers did, and he was hired anyway. Does that go to the question of public — whether or not he's a policymaker? Because he's really using information he's used during the course of his employment. Whether it's confidential in a strict sense, that's where he's getting his information. Well, that doesn't make him a policymaker. The — Well, but does — is somebody a policymaker if he or she is using confidential information or — No, it does not. — confidential relationship? No. The Elrod grantee cases very clearly set out, along with the — with the Fossil Radio facts, set out what a policymaker is. A policy is someone, indeed, who makes policies, who advises someone who makes policies, who is in a confidential or political relationship with a policymaker. These cases, going back to Judge Hurwitz's concerns about the lawyers, are typically lawyers who are advising elected officials. So if you are the mayor and you have an attorney who is advising you, then you are in a policymaker position. The fact — the problem here, again, the record is void that of any evidence or any fact that Mr. Ryan had any kind of policymaking decision, simply because he discloses without indicating he is an employee, that this person was hired over two more qualified women, does not make him a policymaker. He's just citing a fact, which is also part of public record, because this hiring process has to be public because everything the government does has to be in the sunlight. So he didn't cite anything that was not already in the public record. And therefore, he didn't disclose any confidential information, nor was he a policymaker. Can I ask you a different question? Certainly. In most of the First Amendment retaliation cases that I'm thinking of, the concern we as a court would have is where the employer is taking adverse action against the employee really because of disagreement with the content of the speech in some fashion, right? The person is making some statement that the employer disagrees with. Right. And I guess this case seems different to me because I don't have that concern here. It seems as though to the extent that the Facebook page played a role at all in the workplace conduct that he was engaged in, the only role it played was in kind of further illustrating this campaign of harassment that your client had engaged in. So it's not really the First Amendment-protected content of the speech that factored into the employment decision. It's just the harassing nature of it. Do you know what I'm saying? Well, I know what you're saying, Your Honor, and, indeed, that begs the question of a factual dispute. Indeed, that doesn't mean they get to have qualified immunity as a matter of fact. They get to present that as their defense to a jury. They get to put it on the jury verdict form, and then we put on evidence, and the jury can decide whether factually they're entitled to qualified immunity. But they cannot come to this Court and point to anything in the record that compels this Court to find as a matter of law they're entitled to a qualified immunity. Why? Because it was a clearly established right, free speech was. Political speech is the highest type of speech that's protected. I know. No, no. But I'm just saying, is there any suggestion here that either the defendant, Mr. is it Fabella, or the board, that they, I don't know, somehow disagreed with your client's assertions about Mr. Terrasas? No. To the contrary. They agreed. They — Mr. Fabella agreed with my client's assessment that this particular individual was not pulling his weight. He was not working. He was not productive. He was incompetent. But the subject of the post is about his fitness to serve as a city councilman. That's what I'm talking about. No one disagreed with that. No one disagreed. They fired him because he made the post. Period. No one disagreed with the post. That may or may not be true. There were a lot of other reasons to do it. This might have been a contributing factor. But as you said, that goes to the jury. Yes. That goes to the jury. Those are questions of fact. And I'm going to reserve for a minute because I will get those — No, no. You're — she reserves. You're done. Oh, okay. You better say it now. Okay. Well, it's in the brief. The bottom line is I just want to thank you very much. But, again, there is no evidence in this case, no deposition testimony from Mr. Fabella, no declaration. Look at his declaration. He doesn't say he made a mistake. He does not say that Mr. Ryan was a policymaker. He doesn't say that he advised Mr. Ryan. Mr. Ryan advised anyone. And there was no disruption because once the publication occurred on June 21, it wasn't discovered until eight months later, on February 20th. And on that date, February 20th, Mr. Fabella said, I was going to fire him, on that date. And you can find that in the record, in ER 6 and page 18. And that one goes to the jury as to — That's going to the jury. Yes. And then on June 5th, the day they entered into a settlement with Terrasas, at 430, that same day, they fired Mr. Ryan. So the speech was the motivating factor. claim that it was anything before the speech. That question, I think, is not in front of us. Yes. It's not. It's not. But the last point is that there was no disruption. Any disruption would have to be actual. And it had to be after the speech. No one knew about it in the workplace. It has to be material disruption. And it has to be substantial. The record here shows there was no disruption. Okay. You're over time, so if you've got one sum-up point to make or one — No. The point, the bottom line is that the district court order must be affirmed. Thank you very much. Thank you. If you'd put a minute and a half on the clock, please. Thank you, Your Honors. If it pleases the Court, I would like to answer Your Honor Hurwitz's question about other cases involving attorneys that may be instructive for the Court. We discussed Biggs. In addition, there's a Ninth Circuit case, Rendish, where an assistant city attorney sued for First Amendment retaliation. And in that case, the Court in — this Court found that the government's interests outweighed the interest of the attorney's right to speech in that case. In addition, there's a Tenth Circuit case cited by Mr. Fevella, the Weaver case, where, similarly, the assistant city attorney sued for First Amendment retaliation. And the Court there also said that the government interest in effective and efficient operations outweighed any interest in free speech that the attorney had in that case. There's also the — Rendish, as I understand it, didn't turn on the policymaker issue, though. Neither of those did, Your Honor. But what they illustrate, sir, is the second of the three points that we argue on our appeal, is that in this case, Mr. Fevella or VTA's interest outweighed the free speech interests of Mr. Ryan. I'd also like to, just on the policymaker note, in the Biggs and the Fazio versus City and County of San Francisco cases, both Ninth Circuit cases, it indicates that a person who occupies a policymaking position can be one who is a confidential employee or one who requires technical competence. And I don't know, you know, what other profession other than an attorney requires more technical competence. In addition, he was a policymaker. He was carrying out the labor relations direction of the VTA board. It was his responsibility to handle that. Okay, and I'll say the same thing to you. Would you sum up? Yes, Your Honor. Thank you. The final point I want to make is that qualified immunity is also warranted in this case because the underlying right to free speech was not clearly established in light of the long-term interpersonal dispute between Ryan and Terrazas. Given Ryan's insubordination and failure to follow Mr. Fevella's directive to improve his relationship with Mr. Terrazas, the actual material and substantial disruption that we've described in our papers, and given Mr. Ryan's role as a confidential employee and attorney for VTA with duties of confidentiality and loyalty. Thank you. Thank you, Your Honors. Thank both sides for their argument. Ryan versus Fevella submitted for decision. Thank you.
judges: W. Fletcher, Watford, Hurwitz